Filed 2/21/24  P. v. Parsons CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JASON THOMAS PARSONS,<br><br>    Defendant and Appellant. | H049411<br>(Santa Clara County<br>Super. Ct. No. C2007064) |

Appellant Jason Thomas Parsons was convicted by jury trial of four counts of robbery and a single count of being a felon in possession of a firearm.  The jury also found true allegations of four prior strike convictions and two prior serious felony convictions.  The trial court sentenced Parsons to an aggregate term of 100 years to life consecutive to 50 years in state prison.

On appeal, Parsons argues that the trial court abused its discretion by permitting a police officer to testify that tattoos visible in one surveillance video matched tattoos visible in another surveillance video.  Parsons contends that this was inadmissible opinion evidence and that it violated his due process rights.  Parsons also challenges the testimony of a firearms expert.  He argues that the trial court erred by allowing the expert to testify that the bullet casing from one of the crime scenes matched the bullet casing from a recovered firearm, and that the expert's opinion was definitive.  He also argues that the method used by the expert to reach his conclusion is no longer generally accepted by the scientific community, and therefore it should have been excluded entirely.

We find no error with respect to the lay opinion testimony about the tattoos.  With respect to the firearms expert testimony, we need not determine whether the trial court erred in any respect; even if error is assumed, it is harmless under the applicable standard.  Accordingly, we will affirm the judgment.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  Prosecution's Case

##### a. Taco Bell Robbery

On May 2, 2020, around 11:39 p.m., a man entered a closed Taco Bell restaurant through a back door that an employee had propped open to take out the garbage.  The man entered the office, where the manager had been putting money in the safe.  The man was wearing a mask, black beanie, black hoodie, and ripped blue jeans.  He appeared to be Caucasian and was "[m]aybe a little taller" than the manager, who was five feet seven inches tall.  The man ordered the manager at gunpoint to open the safe.  The manager replied that she could not open the locked safe but offered him all the money in the cash register tills that were in the office.  After taking the money, the man left.

##### b.  Pizza My Heart Robbery

On May 6, 2020, around 4:20 p.m., a man entered a Pizza My Heart restaurant and was approached by an employee.  The man pulled out a gun and asked the employee to hand him money.  The employee saw the man pull the slide on the gun, which was about 18 inches away from him, to load a bullet into the chamber.  The employee ran to the back of the store to hide, but returned after the man turned his gun on another employee.  The employee opened the safe and the register, and the man took the contents of both.

The man wore a brimmed hat, gray long-sleeved shirt, gray pants, and black shoes with white soles.  He was also wearing a medical mask with a filter.  The employee did not recall seeing any tattoos or scars and could only see the man's forehead.  From what the employee saw, the man "looked to be Black."  Prior to the robbery, surveillance

2

footage outside the restaurant captured the man exiting the driver's side door of a black sedan.

### c. Popeye's Chicken Robbery

Around 6:00 p.m. on May 6, 2020, a man wearing a mask and a hat entered a Popeye's Chicken[1] restaurant. The manager could see that the man was White, with brown hair, and had light-colored eyes. The manager estimated the man was "[p]robably" 5 foot 8 inches or 5 foot 9 inches tall. The man pointed a gun at the manger and demanded that she open the cash register. The man jumped over the counter, approached the manager, and again demanded that she open the cash register. She eventually opened the register; the man took the entire cash till and left the restaurant.

### d. Apatzingan Market Robbery

On May 8, 2020, around 1:20 p.m., a man with light-colored eyes wearing a bandana, green sweatshirt, and khaki or brownish-colored pants entered an Apatzingan Market with a gun. The man pointed the gun at a cashier and ordered her to open the register. The cashier replied that she did not have a code to open the register and could only open it when a customer made a purchase. The man asked again, and the cashier reiterated that she was unable to open it. The man then went behind the cashier and held the gun to her back. A customer then approached the register to purchase beer. The man then went behind the customer and took the beer, and the cashier ran towards the office.

The manager saw the cashier running, exited his office, and saw a man with a mask and beer going towards the office. The man took out a gun and pointed it at the manager. The manager moved to the side to get out of the way, but the man grabbed the manager and directed him to come to the office. The beer slipped and the bottles broke, causing the manager to slip and fall blocking the entrance to the office. The man went in

---

[1] The manager testified that she worked at "Popeye's Chicken." Although the correct name of the restaurant appears to be "Popeyes Louisiana Kitchen," we shall use "Popeye's Chicken" or "Popeye's" since that it how it is referred to in the record.

a different direction for a moment, then came back and fired his gun at the manager, missing him. The man left. Police later found and recovered a shell casing from inside the office.

### e. Isaac Sandoval's Arrest and Testimony

An employee at the Popeye's restaurant provided police with a partial license plate of the suspect vehicle, which police matched to a black Toyota Camry belonging to Isaac Sandoval. Sandoval was arrested. He initially denied involvement in any of the four robberies, but later identified Parsons as the perpetrator after police confronted him about the surveillance footage. Sandoval told police that Parsons drove his car, while Sandoval sat in the passenger seat during the robberies. Sandoval provided nonpublic information concerning the robberies, including that Parsons entered the Taco Bell restaurant through a back door that had been propped open.

Sandoval testified against Parsons at trial. He stated that he pleaded guilty to charges related to the robberies and agreed to testify against Parsons in order to avoid a life sentence. Sandoval first met Parsons as a teenager in Juvenile Hall. They reconnected in May 2019 at a homeless shelter. At some point, Parsons moved into a storage facility.

On the day of the Taco Bell robbery, Parsons asked to borrow Sandoval's car, a 2012 black Toyota Camry. Sandoval picked Parsons up at his storage facility, and Parsons then drove. After running an errand, the two "started talking about trying to find a place to rob." Around 11:00 p.m., Parsons, who was still driving, "decided on the Taco Bell and [Sandoval] went along with it." Parsons parked the car in front of the store. Parsons and Sandoval saw an employee prop open a back door. Parsons put on a mask and ran inside through that door. He returned about five minutes later with several tills of money. After handing Sandoval the money, Parsons drove the two away. The two eventually went back to Parsons's storage unit.

4

On May 6, 2020, Parsons and Sandoval met in the early afternoon. Sandoval again picked up Parsons, with Parsons then driving. Parsons drove because he did not trust Sandoval to drive because Sandoval sometimes had blurry vision from high blood pressure.[2] At some point, Parsons decided to rob the Pizza My Heart restaurant because he knew the location and said it would be a good spot. Parsons parked in the back of the restaurant and went inside. Parsons was wearing gloves, a face mask, and a fishing hat. Parsons returned to the car less than 10 minutes later carrying tills and a small cardboard box with cash inside. Parsons got back into the driver's seat, and they drove to Parsons's girlfriend's house. At Parson's direction, Sandoval removed the cash from the tills and tossed the empty tills out of the window.

Parsons stopped at his girlfriend's house while Sandoval remained in the car. After about 20 minutes, Parsons returned and drove the car to the Popeye's, which was about 10 minutes away. Parsons, wearing a mask and the same outfit as the Pizza My Heart robbery, entered the Popeye's after waiting for some people to leave. Sandoval could not see what was happening in the restaurant. Minutes later, a number of employees ran out of the restaurant, and then Parsons walked back towards the car carrying two or three tills. The two went directly to Parsons's storage unit and counted the money. Parsons then exited the car, and Sandoval left.

On May 8, 2020, Parsons drove a newly purchased car to Sandoval's house. After hanging out for a while, Parsons said he wanted to do some errands and laundry. Parsons wanted to take Sandoval's car. The two went to Parsons's storage unit, first stopping at a 7-Eleven along the way to purchase food and coffee. They then went to the laundromat. Sandoval began to feel very sick and made an appointment for emergency dialysis. However, Sandoval did not make it to the appointment, as Parsons "started talking about finding a place to rob" instead.

_____

[2] Sandoval was also suffering from kidney failure requiring frequent dialysis.

5

After finishing the laundry, they drove to a "Mexican market" across the street from the laundromat. Parsons was wearing a hat, gloves, and a mask. Parsons went inside. Less than 10 minutes later, Parsons returned. Sandoval noticed Parsons was not holding anything, which he thought was strange. After Parsons sat in the driver's seat, he told Sandoval that "people in there . . . they fought back at him" and that he did not get anything. Parsons said "that he was mad. That he let out a round. He fired his gun in there." Sandoval was in disbelief. They returned to Sandoval's house, and Sandoval left to receive dialysis treatment. Sandoval was arrested while at treatment.

### f. Police Investigation

Todd Wellman of the San Jose Police Department, a robbery detective, was assigned to investigate the four robberies. Wellman received a partial license plate match from a witness at the Popeye's robbery and was able to identify Sandoval's car that day. Following Sandoval's arrest and interview, Wellman obtained surveillance footage from 7-Eleven and Parsons's storage facility. Surveillance video from the 7-Eleven showed a man whom Wellman, based on tattoos visible in the video, identified as Parsons. Video from the storage facility showed that on March 2, 2020, around 5:15 p.m., Sandoval's black Toyota Camry dropped off Parsons outside an individual storage unit. Parsons was wearing ripped blue jeans and black shoes with white soles. Video from the same facility on March 3, 2020, around 12:43 a.m., showed Sandoval and Parsons. Parsons was wearing an outfit similar to the suspect of the Taco Bell robbery, which had occurred about an hour earlier: black hoodie, ripped blue jeans, and black shoes with white soles.

Police obtained and executed a search warrant for Parsons's storage unit. Inside the facility was a black BMW and an additional space that had been fashioned into a living area. Police recovered a black Springfield XD semiautomatic handgun. Brian Karp, an expert in firearm and toolmark analysis, examined a .40-caliber shell recovered from the market robbery and compared it with a .40-caliber shell recovered from a test-

6

fired round. He concluded that the shell casing found at the market matched the test-fired shell casing, and opined that the recovered shell was fired from Parsons's gun.[3]

A DNA sample was recovered from the trigger of the gun, and it was determined that at least three individuals contributed to the DNA found. Sandoval was excluded from the mixture; Parsons was included as a possible contributor. Assuming three contributors, the likelihood of this particular DNA mixture "is at least ten times greater" if Parsons and "two unknown individuals are contributors, than if three unknown individuals are contributors."

As part of the investigation, Wellman obtained call detail records for Parsons's and Sandoval's cell phones. Cell phone location data showed that Parsons's and Sandoval's cell phones were near the Taco Bell prior to the robbery. The location data also showed that in the hours prior to the Pizza My Heart robbery, both cell phones were on the move and both continued to connect to towers in the same approximate locations. Around the time of the Pizza My Heart robbery, Sandoval's and Parsons's cell phones connected to a tower near the restaurant. Around the time of the Popeye's robbery, both cell phones connected to towers near that restaurant. Finally, 23 minutes prior to the Apatzingan Market robbery, Parsons's cell phone connected to a tower about two miles away from the market. Immediately prior to the robbery, Sandoval's cell phone connected to a tower less than a half-mile from the market. After the robbery, location data showed both cell phones connected to two towers at the same location.

Wellman testified that Parsons was recorded in phone calls with prison inmates. In a call on April 6, 2020, Parsons stated, " 'I didn't go start hitting licks like immediately.' " Wellman testified that the phrase " 'hitting licks' " means "[d]oing robberies." After the inmate on the call said, " 'It's kind of hard to hit fucking houses, too, 'cause all the people at home' " (presumably referring to the pandemic shutdown),

---

[3] Karp's testimony will be discussed in greater detail in the Discussion section.

Parsons responded, " 'Oh, yeah, everybody's at home. Nah, but restaurants, all of them are closed; so, like, everything is drive-through.' " Parsons added that he planned to " 'just walk up there and lay that shit down.' "

In other calls, Parsons discussed trying to purchase a handgun. On May 2, 2020, Parsons reported successfully purchasing a .40-caliber gun in Sacramento, a trip that was confirmed by Parsons's cell phone location data and Sandoval's testimony. On May 8, 2020, Parsons reported that he "had to ping one off" that day after someone "tried to charge" Parsons, apparently referring to firing off a round at Apatzingan Market. Parsons also reported being "uniformed up as a skier," apparently in reference to being dressed like a skier with a ski jacket, ski hat, and glasses.

## 2. Defense Case

Parsons testified on his own behalf and denied committing the robberies. In recounting his background, he explained that he had spent time in prison related to burglary convictions when he returned to the San Jose area in 2009 and met Sandoval at a homeless shelter. Sandoval was an active Sureño gang member at the time. Parsons had dropped out of the Norteño street gang while in prison. Parsons reported working numerous jobs, and in early 2020, after the COVID-19 pandemic shutdown began, he began stealing catalytic converters.

Parsons testified that in April 2020, he began buying and selling guns, which were "a hot commodity in San Jose . . . ." He explained that when he discussed the possibility of committing robberies in the recorded calls, he was doing so "jokingly," and that his intention was to only suggest how someone else might want to commit robberies.

Parsons testified that on May 2, 2020, he and Sandoval went to Sacramento to purchase two .40-caliber Springfield XDs, one of which was for Sandoval. After the trip, Parsons and Sandoval parted ways, and Parsons stayed at his storage facility to work on his car. Sandoval returned later that day, and in surveillance footage from 5:15 p.m.,

8

could be seen wearing a mask that Parsons said was similar to the one seen in the Popeye's surveillance video. Parsons said he never discussed robbing restaurants.

The two left together, with Parsons wearing light blue jeans and a gray shirt, but not a black beanie and black hoodie as depicted in the Taco Bell robbery video. A friend of Sandoval's joined them, and eventually Parsons was dropped off so he could run errands. Parsons tried to contact Sandoval to pick him up but was unsuccessful. Around 11:15 p.m., he contacted his girlfriend who came and picked him up. Parsons went to his girlfriend's house, then returned to his storage unit around midnight. Sandoval and a "Southerner friend" arrived at his storage unit around 1:00 or 2:00 a.m. Parsons learned that they may have hopped the fence in view of the security camera. After viewing the security video showing someone leaving Sandoval's car and hopping the fence, Parsons denied it was him. Parsons explained he "wouldn't hop the fence" in view of the cameras.

Parsons did not recall what he did on May 6, 2020, the day of the Pizza My Heart and Popeye's robberies. Parsons explained that he had been a tattoo artist for about nine years and having examined the tattoos seen in the Popeye's surveillance video, he opined that it did not match his tattoo. He also recognized the bandana, or as he called it "a tubular smock," seen in the Popeye's surveillance video as belonging to Sandoval.

On May 8, 2020, Sandoval went to Parsons's storage unit. Parsons acknowledged going to 7-Eleven with another friend, not Sandoval, and he recognized himself in the surveillance video. Sandoval stayed at the storage unit. After going to 7-Eleven, Parsons said he went back to his storage unit and then went to do laundry. When Parsons returned, Sandoval had invited two of his friends, so Parsons asked him to leave. Later, Sandoval called Parsons and said he needed help. Sandoval had a friend who wanted to trade guns with Parsons or have Parsons buy the friend's gun. Parsons declined, believing that the gun had been used to shoot someone. Parsons denied going to

9

Apatzingan Market, participating in a robbery there, or ever wearing clothing similar to that depicted in the surveillance video.

Later that day, Parsons visited Sandoval and got into an altercation with Sandoval's neighbor, who was wearing clothing similar to that seen in the Apatzingan Market robbery surveillance video. During the altercation, the neighbor grabbed toward something in his pocket, which Parsons presumed was a weapon, and so Parsons hit him, knocking him out. Parsons left, and texted Sandoval to tell him, "I'm not going to hang out with you anymore."

Speaking to the May 8, 2020, recorded phone call, Parsons explained that when he used the phrase, " '[p]ing one off,' " he meant a "knockout punch" to the neighbor, not firing a gun. The reference to being " 'a skier' " meant that he "skied out of there" after delivering the knockout punch.

Parsons said he was about six feet, or six feet one inches tall, weighed 185 pounds, and had brown eyes. When Parsons was arrested, his wallet contained "a little over 200" dollars, mostly in $20 bills. The money did not come from a robbery, but rather from Parsons's "state tax refund or unemployment or stimulus" or from one of his girlfriends. He later clarified "it was probably [his] California tax refund" and confirmed he received a direct deposit of $475 from the Franchise Tax Board on May 8.

## B. Procedural Background

In June 2020, the Santa Clara County District Attorney filed an information charging Parsons with robbery (counts 1-4; Pen. Code., § 212.5)[4] and with being a felon in possession of a firearm (count 5; § 29800, subd. (a)(1)). It was alleged, for counts 1 through 3, that Parsons personally used a firearm (§ 12022.53, subd. (b)), and for count 4, that Parsons intentionally discharged a firearm (§ 12022.53, subd. (c)). It was also

---

[4] All statutory references are to the Penal Code, unless otherwise indicated.

alleged that Parsons had six prior strike convictions (§§ 667, subds. (b)-(i); 1170.12, subd. (c)) and three prior serious felony convictions (§ 667, subd. (a)(1)).

In November 2020, the jury convicted Parsons on all counts and found true the firearm allegations. Following a bifurcated proceeding on the prior-conviction allegations, the jury found true the prior strike and prior serious felony convictions.

In August 2021, the court sentenced Parsons to an aggregate term of 100 years to life, consisting of consecutive terms of 25 years to life on counts 1-4. As to counts 1 through 3, the court imposed three 10-year terms for the firearm enhancements, and for count 4, the court imposed a 20-year term for the intentional discharge enhancement, all running consecutive to the 100-year term. For count 5, the court imposed a concurrent term of six years in state prison.

In September 2021, Parsons timely appealed.

## II. DISCUSSION

### A. Tattoo Testimony

Parsons argues that the trial court erred by permitting Wellman to compare the tattoos seen in a photograph of Parsons with still images taken from the 7-Eleven and Popeye's surveillance videos. Parsons contends that such evidence was inadmissible opinion evidence and its use violated his due process rights. For the reasons stated below, we disagree.

#### 1. Background

Prior to trial, Parsons moved in limine to exclude Wellman's opinion that Parsons's tattoos matched those of the person seen in the Popeye's surveillance video. Parsons argued that the expected testimony consisted of improper lay opinion. The trial court ruled that the testimony was proper lay opinion, and therefore was admissible.

At trial, Wellman testified that he recognized Parsons in the 7-Eleven surveillance video based in part on the tattoos visible on his back, neck, and left arm. Wellman also testified that he recognized Parsons from the Popeye's surveillance video. Wellman

11

explained that after Parsons's arrest and interview, photographs of Parsons's tattoos were taken. Wellman compared the visible portion of the robber's tattoos in the Popeye's video with the photograph of Parsons taken after his arrest and stated that there was a match between the letters. Wellman explained the types of letters involved and why, in his opinion, there was a match. Wellman then compared the visible tattoos from the 7-Eleven surveillance video with the Popeye's surveillance video, and again noted "matching points" in the lettering.

### 2. Analysis

Courts "have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).) "A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. [Citation.] '[T]he identity of a person is a proper subject of nonexpert opinion . . . .' [Citations.]" (*Ibid.*) We review the trial court's ruling allowing Wellman's testimony for an abuse of discretion. (*Id.* at p. 600.)

In *Leon*, our high court held that an officer's identification of the defendant in surveillance videos of two robberies was proper lay opinion testimony. (*Leon*, *supra*, 61 Cal.4th at p. 600.) The officer in *Leon* testified that he was " 'very' familiar with [the] defendant's appearance," having arrested him and from later seeing him "nearly 10 times." (*Id.* at p. 601.) The officer also observed that the jacket that the defendant wore during his arrest had similar features as the one worn by an individual in one of the videos. (*Ibid.*) The *Leon* court held the officer's familiarity and personal knowledge of the defendant's appearance "around the time of the crimes," combined with the fact that his testimony "aided the jury," meant that the trial court did not abuse its discretion by admitting the lay opinion testimony. (*Ibid.*)

As in *Leon*, in this case, Wellman interviewed Parsons after his arrest, reviewed photos taken of Parsons after his arrest, and reviewed the surveillance videos. His

description of similarities between Parsons's tattoos and those seen on the person in each of the surveillance videos aided the jury in identifying those similarities. Because Wellman's "testimony was based on his relevant personal knowledge and aided the jury," it was the proper subject of lay opinion testimony and "the court did not abuse its discretion by admitting it." (*Leon*, *supra*, 61 Cal.4th at p. 601; accord, *People v. Mixon* (1982) 129 Cal.App.3d 118, 128-130 [trial court properly admitted officer's lay opinion testimony identifying defendant in surveillance photographs].)

Parsons contends it was improper for the trial court to admit Wellman's comparison of the tattoo seen in the 7-Eleven video with the partially visible tattoo seen in the Popeye's surveillance video because the testimony did not *require* personal knowledge or familiarity with Parsons's appearance. We disagree with the premise of this argument as it misapprehends the standard for permitting lay opinion testimony. That standard requires that the testimony be based on personal knowledge and that it aid the jury. Here, although Wellman was not *required* to have personal knowledge of Parsons's appearance to make observations between the partially visible tattoos seen in the two surveillance videos, his testimony nevertheless *relied* on his familiarity with Parsons's tattoos and in that way his testimony aided the jury. It also explained to the jury how Wellman came to conclude that the surveillance video confirmed Parsons's presence at the Popeye's robbery. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1254 (*Virgil*) [noting identification testimony was "helpful for the jury to understand how [the detective] came to suspect" the defendant's involvement].) The testimony was therefore admissible.

Finally, even assuming the trial court erred, Parsons cannot show prejudice. Generally, the admission of evidence in violation of state law, such as the Evidence Code, is reversible only upon a showing that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Here, assuming error, the error

13

could not have been prejudicial given Parsons's cross-examination of Wellman, his own testimony, and the jury instructions. Parsons thoroughly cross-examined Wellman on the tattoo identification, challenging Wellman's conclusions and pointing to areas of potential dissimilarity. Parsons, testifying on his behalf, also described differences in the tattoos, which contrasted sharply with Wellman's opinion. (See *People v. Bradley* (2012) 208 Cal.App.4th 67, 84 [the defendants had "ample opportunity" to cross-examine witnesses who provided lay opinion testimony, "dispelling any possible prejudice"].) Moreover, because the relevant photographs and surveillance videos were shown to the jury, "jurors could make up their own minds about whether the person shown was [the] defendant." (*Leon, supra*, 61 Cal.4th at p. 601; see also *Virgil, supra*, 51 Cal.4th at p. 1254 ["The jury was, of course, free to draw its own conclusion"].)

In addition, the court instructed the jury with CALCRIM No. 333, which told the jury to evaluate lay witness opinion testimony, considering "the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion." The court also instructed the jury with CALCRIM No. 226, telling the jury that "[y]ou alone, must judge the credibility or believability of the witnesses. In deciding whether the testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have." The instruction added, "[y]ou may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." We presume the jury understood and followed the instructions the court gave under CALCRIM Nos. 226 and 333. (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9; *People v. Gray* (2005) 37 Cal.4th 168, 217.)

Finally, Parsons asserts that there was federal constitutional error. However, "the admission of evidence, even if erroneous under state law, results in a due process

14

violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test." (*Ibid.*) Given Parsons' opportunity to cross-examine and testify on his own behalf, as well as the jury instructions, we conclude that Wellman's testimony comparing the tattoos seen in the surveillance videos to Parsons's tattoos did not render the trial fundamentally unfair.

### B. Firearm and Toolmark Evidence

Parsons argues that Karp's expert testimony concerning toolmark comparison should have been excluded. He contends that the trial court erred by abandoning its gatekeeping role. He also contends that the testimony should have been excluded because toolmark comparison is no longer accepted in the pertinent scientific community.

#### 1. Background

##### a. Motion in Limine

Parsons moved in limine to exclude expert testimony on firearms toolmark comparison, arguing that "the methodology of firearms toolmark pattern matching is not based on reliable principles and methods, and thus, lacks foundational validity." He therefore argued that under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), the method no longer enjoyed sufficient acceptance in the relevant scientific community and was thus inadmissible.[5]

Parsons pointed to three recent reports criticizing the scientific validity of toolmark pattern matching: (1) National Research Council of the National Academies,

---

[5] "Until 1993, this rule was generally known in this state as the *Kelly-Frye* rule because this court in *Kelly* had relied on the reasoning of a federal appellate court decision, *Frye v. United States* (D.C. Cir. 1923) . . . , 293 F. 1013 (*Frye*). In 1993, the United States Supreme Court held that the Federal Rules of Evidence had superseded *Frye* (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 587 . . . ), and our state law rule is now referred to simply as the *Kelly* test or rule. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 544-545 (*Bolden*).)

Ballistic Imaging (2008); (2) National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward (2009); and (3) President's Council of Advisors on Science and Technology, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (2016). Relying on these reports, Parsons argued that firearms toolmark comparison evidence was no longer generally accepted as reliable, the bases for the expert opinion were based on conjecture and speculation, and the evidence was more prejudicial than probative.

The court denied the motion. The court stated, "this type of evidence has been admissible in court for decades." The court agreed with the prosecution that, under *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*), toolmark comparison evidence was not subject to the *Kelly* framework. The court acknowledged the reports cited by Parsons but likened it to a situation that happens in "virtually any other discipline [where] there are opposing experts." In that instance, the court added, the jury gets to decide "whether to believe one or the other or neither."

### b. Expert Witness Testimony at Trial

At trial, Karp testified as an expert in the fields of firearm analysis and toolmark analysis. Karp explained that, in Parsons's case, he received a single .40-caliber shell casing as well as a .40-caliber Springfield XD handgun, and he was asked to compare the shell casing with the recovered firearm. In order to compare the firearm with the recovered shell casing, Karp generated a known specimen by taking shell casings from 11 test firings and creating silicone casts from each of the 11 shell casings. Karp then viewed the silicone casts under a microscope, first looking for class characteristics such as caliber or shape of the firing pin. Such characteristics are not necessarily unique to a specific firearm but are used by Karp to "sort" the shell casings. Karp then looked to see if the recovered shell casing matches any of the class characteristics of the test shell casings: "If so, continue on. If not, you can stop." In Parsons's case, Karp found no

16

differences in class characteristics that would exclude the recovered shell casing from having been fired from the Springfield XD handgun.

Karp then described some of the individual characteristics that he examines, which "are unique to each firearm." As a firearm is produced, the tools used to "cut all the different components of the firearm" wear and each tools' surface changes "as it's making one gun to the next gun to the next gun because of the metal-on-metal interaction." This interaction creates "unique surfaces on the firearm." Karp explained that these features transfer over to ammunition "because the ammunition is softer than the firearm parts." Karp then explained that he uses a stereomicroscope to "evaluate individual detail, individual characteristics side by side," to look for "correspondence." Karp then "document[s] it . . . the totality of it" so that he "can then render a conclusion based on how much–what I see, essentially." Karp elaborated that from "shot-to-shot," even from the same firearm, there is always some variation. However, in his evaluation, Karp said he is "looking for a level of agreement." He added, "I expect to see some disagreement in a shot-to-shot variation when I compare, but that's not what I'm focusing on. I'm focusing on whether or not there's enough agreement for me to make a conclusion that this is the responsible firearm or not."

Karp acknowledged the criticisms of the science of firearms analysis, and that ultimately his opinion is a subjective one. But, he added, his opinion "is grounded in scientific analysis for the last 100 years, the exchange of information amongst our community," as well as his "extensive training" and "the 17 years of work" that he has done to "validate the science."

Based on his analysis of the class and individual characteristics, Karp opined that the Springfield XD found in Parsons's storage unit fired the .40-caliber shell casing found at the Apatzingan Market. As to certainty, Karp said, "my conclusion is a definitive conclusion, but it can be argued that its's not an absolute conclusion." He continued, "and the reason why is that I can't have the ability to look at every single firearm in the

17

world, but based on my training and experience, the community's training and experience, and shared information, my casework, and all of the validity studies that have been done over the last 100 years, it's not credible for me to believe that the level of agreement that I'm using to make my conclusion would ever be seen on any other firearm if I had had the opportunity to look at every other firearm in the world." Karp concluded, "And so for me, although we say it's a practical exclusion of all other firearms in the world, for the record, it's not an absolute, because I cannot look at every other gun. But being said, if I did, it's not credible to me to believe that any other gun in the world would have these kinds of similar markings at this level for me to render this conclusion; so I'm very comfortable in my conclusion."

### 3. Legal Principles

"Under *Kelly*, the proponent of evidence derived from a new scientific technique must establish that: (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used." (*People v. Doolin* (2009) 45 Cal.4th 390, 445.) "When the continuing admissibility of scientific evidence is at issue, rather than it being the proponent's burden to show the technique is generally accepted by the scientific community, the burden shifts to the opposing party to produce new evidence showing it no longer is. [Citation.] Appellate review of a trial court's determination regarding a scientific technique's general acceptance is de novo." (*People v. Azcona* (2020) 58 Cal.App.5th 504, 511 (*Azcona*).)

Additionally, "[t]rial judges have a critical gatekeeping function when it comes to expert testimony beyond merely determining whether the expert may testify at all. Expert evidence that does not require a *Kelly* analysis must still be admissible under Evidence Code section 801, which mandates it be 'of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject.' (Evid. Code, § 801, subd. (b); [citation.]) Further, under Evidence Code sections 801, subdivision (b), and 802, the

18

court must act as a gatekeeper to ensure the opinions offered by an expert are not 'based on reasons unsupported by the material on which the expert relies.'  [Citation.]  'This means that a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning.  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." '  [Citation.]  A trial court's decision regarding the permissible scope of an expert's opinion is reviewed for abuse of discretion."  (*Azcona*, *supra*, 58 Cal.App.5th at p. 513, quoting *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771.)

### 4. Analysis

Relying on the concurring opinion in *Azcona*, *supra*, 58 Cal.App.5th at pages 518 to 529, Parsons argues Karp's testimony was inadmissible under *Kelly*.  The Attorney General relies on *Cowan*, *supra*, 50 Cal.4th 401, for the proposition that toolmark testimony is not required to meet the *Kelly* standard for new scientific methods.  In *Cowan*, the Court held *Kelly* did not apply to the expert's testimony partly because that expert's method—visual comparison of markings on bullets recovered from the victim's body with a silicone rubber cast of the gun's interior barrel—was not " 'so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.'  [Citation]."  (*Cowan*, at p. 470.)  In *Azcona*, the concurrence distinguished the Azcona expert's testimony from the testimony considered in *Cowan* because the expert in Azcona's trial used a different method and his testimony went beyond a mere visual comparison of the markings.  The expert in *Azcona* offered statistical estimates of the chances that random chance would result in a false match due to similar markings on bullets fired from two different guns.  (*Azcona*, at p. 526.)  The concurrence opined that such testimony required scientific methods and statistical analyses that go beyond the common experience and knowledge of laypersons, thereby implicating the *Kelly* standard.  (*Ibid.*)  Applying *Kelly*, the concurrence maintained that the trial court erred by admitting the testimony because

19

the NRC and PCAST reports reflected a change in the attitude of the scientific community towards the reliability of the methods commonly used in firearm toolmark analysis.

Unlike in *Azcona*, the expert here expressly declined to offer any statistical or quantitative estimates of the chances he may have erroneously concluded the cartridges were fired from the same gun; he instead admitted his conclusion was "ultimately subjective." However, he further testified that while his conclusion was not "absolute" because he could not examine every gun in existence, his conclusion was "definitive" based on his experience and training.

While by its own terms, that testimony goes beyond the common experience of laypersons, we need not determine whether the trial court erred by admitting the firearm evidence under *Kelly*, or whether it abandoned its gatekeeping role under Evidence Code sections 801 and 802. "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247 (*Prieto*), quoting *Watson*, *supra*, 46 Cal.2d at p. 836.)

The evidence of Parsons's guilt was strong even without Karp's testimony. Sandoval, Parsons's accomplice, identified Parsons as the perpetrator of the robberies. His account, moreover, was independently corroborated by other evidence. For instance, he recounted details such as how Parsons entered the Taco Bell. Parsons was captured on video wearing an outfit similar to the Taco Bell robber. Sandoval's description of Parsons's outfit for the Pizza My Heart robbery generally correlated with what was captured by surveillance video. Parsons was also captured discussing his intent to buy a gun to use in a robbery, and also recorded stating he "had to ping one off" on the day of the Apatzingan Market robbery. Further, cell phone location data corroborated the prosecution case that Parsons was present at and participated in the robberies. Thus, even if we assume that the trial court erred by admitting Karp's testimony in part or in whole,

20

the error was harmless because it was not reasonably probable that Parsons would have received a more favorable verdict absent the error.[6]

In addition, the jury's verdicts on other counts confirm the harmlessness of any possible error. The evidence at trial, particularly Sandoval's testimony implicating Parsons as the perpetrator, essentially required the jury to make a credibility determination. In convicting Parsons of the robberies in counts 1, 2, and 3, the jury necessarily believed Sandoval's version of events. Karp's testimony was relevant only to establishing Parsons's guilt on count 4, involving the Apatzingan Market robbery from which the shell casing was recovered. Thus, even assuming error in the admission of Karp's testimony, it is not reasonably probable Parsons would have received a more favorable verdict in the absence of the expert firearm testimony.

Finally, Parsons's claim of cumulative error fails because there are no errors to accumulate. We determined there was no error with regard to Wellman's testimony, and with respect to Karp's testimony, we assumed error but found no prejudice under the applicable standard. Thus, there is "no prejudicial error to accumulate." (*People v. Hensley* (2014) 59 Cal.4th 788, 818.)

## III. DISPOSITION

The judgment is affirmed.

---

[6] Parsons suggests that the higher standard of *Chapman v. California* (1967) 386 U.S. 18, applies here. However, it is well established that errors of state law, including the Evidence Code and particularly the erroneous admission of expert testimony, warrant the *Watson* standard. (*Prieto*, *supra*, 30 Cal.4th at p. 247.) Parsons does not persuasively establish that this case warrants departure from the general rule.

21

_____
Greenwood, P. J.

WE CONCUR:


_____
Grover, J.


_____
Danner, J.

H049411
The People v. Parsons